Ralph M. Stone
Thomas G. Ciarlone, Jr.
SHALOV STONE BONNER & ROCCO LLP
485 Seventh Avenue, Suite 1000
New York, NY 10018
(212) 239-4340
Fax (212) 239-4310

*Attorneys for Plaintiff*



07 CV 7016

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ISTVÀN TEMESFOÏ, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GPC BIOTECH AG; BERND R. SEIZINGER; MARTINE GEORGE; and MARCEL ROSENCZWEIG,<br><br>Defendants. | CASE NO.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Istvàn Temesfoï ("Plaintiff"), alleges the following as his Complaint in the above-captioned matter. Plaintiff so alleges individually and on behalf of all persons and entities (the "Class") who purchased or otherwise acquired the securities of GPC Biotech AG ("GPC" or the "Company"), in the period between December 5, 2005, and July 24, 2007, inclusive (the "Class Period").

The allegations contained herein are made upon information and belief, except as to the allegations about Plaintiff and his counsel, which are made upon personal knowledge. Plaintiff's information and belief are based, among other things, on investigations made by and through his attorneys. Such investigations have included, but have not been limited to, the review and analysis of: (a) filings made by GPC with the

United States Securities and Exchange Commission (the "SEC"); (b) press releases issued by the Company; (c) newspaper, magazine, and other periodical articles relating to GPC and the allegations contained herein; and (d) other matters of public record.

**I.**

**<u>NATURE OF THE CASE</u>**

1.      This is a putative class action against GPC and certain of its ranking executive officers for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      GPC Biotech is a biopharmaceutical company.  For the last decade, its research and development programs have concentrated on securing regulatory approval for Satraplatin, a drug aimed at minimizing pain, maximizing survival rates, and facilitating "progression free survival" for prostate cancer patients resistant to traditional treatments.

3.      By December 2005, when the Class Period begins, GPC had been trying to get Satraplatin to market for years, and the Company was short on time and money.  GPC had a deficit of €229.5 million (approximately $314 million), and it was laboring under the threat that the biotechnology patents for Satraplatin would expire in 2008 and 2010 in the United States, and in 2009 in many other countries.  Because these expiration dates could not be extended unless GPC made major strides in developing Satraplatin, it was incumbent upon the Company to give its partners and investors the impression that Satraplatin was close to "early" approval.

4.      The Individual Defendants hatched a plan to conduct a Phase 3 Satraplatin and Prednisone Against Refractory Cancer ("SPARC") trial, which would set the stage

- 2 -

for marketing approval for Satraplatin from the United States Food and Drug Administration (the "FDA") by 2007. Before the Phase 3 trial began, the FDA approved GPC's "registrational approach" to enrolling patients in the study, but cautioned that the study could result in Satraplatin's approval only if it was performed "flawlessly."

5.    FDA trials must adhere to rigid standards and incorporate milestones, commonly called "endpoints," which the FDA uses to evaluate a drug's safety and effectiveness. Throughout the Class Period, however, Defendants concealed that the Phase 3 trial was deeply flawed because it relied on unorthodox methods for gauging the effectiveness of Satraplatin. Defendants were aware of this not only because of their vast experience in pharmaceutical research and development, but also because the FDA expressly warned them that they had departed from generally accepted protocols and that the trial's "endpoint" was one with which the FDA was "unfamiliar" and had "no prior experience." The FDA also expressed doubts about whether the trial was, in fact, "blind," such that researchers did not know which subjects had received Satraplatin and which had received only a placebo.

6.    Defendants kept these facts and developments from the public until they were compelled to address them due to an upcoming FDA meeting. On May 15, 2007, it was revealed that the FDA would consider approval of Satraplatin at a meeting on July 24, 2007. Early the next month, on June 4, 2007, the Company participated in an oncology conference where it presented data that purportedly showed that Satraplatin was very effective and, as a result, GPC stock climbed $3.16 to close at $32.81 per share.

7.    The truth began to emerge on July 20, 2007, when an FDA committee criticized the benchmarks used to assess Satraplatin's effectiveness, principally including

- 3 -

a so-called "composite endpoint." The committee indicated that the FDA was unfamiliar with this kind of endpoint, which concern had been "clearly communicated" to the Company during the drug's developmental phase. GPC stock in turn plummeted $10.85 over the next two trading days, closing at $20.95 on July 23, 2007.

8.      After the trading day ended on July 24, 2007, the FDA revealed that its Oncologic Drugs Advisory Committee had advised that approval be withheld from Satraplatin and that it would not reconsider the drug until the end of 2008. Dr. Wyndham Wilson, a member of the Committee and a researcher for the National Cancer Institute commented: "Survival benefit may well be seen, but I don't think we see it at the current time."

9.      Reacting to this startling news, GPC stock tumbled an additional $7.20, to close at $13.16 on July 25, 2007. Analysts were stunned by the Company's lack of candor. An analyst at Friedman Billings & Ramsey opined that GPC investors had been deceived and, according to a July 25, 2007, article from *Science Daily*:

> GPC had been handling the discussions with the FDA, and it appears the clinical trial design and endpoints for the SPARC study were never signed off on by the agency even though ... investors ... were under the impression they had been.

10.     *Forbes.com* reported that the July 24, 2007, meeting between GPC and the FDA was nothing less than a "spectacle":

> There was a spectacle at the event, watched via a Webcast. It basically came down to a debate between the company and the FDA in which the FDA insisted, fairly strenuously, that it had let the biotech know that its measures of disease progression and pain were not valid.

11.     On July 30, 2007, the Company announced that it was withdrawing its new drug application for accelerated approval of Satraplatin.

- 4 -

12.    As a result of Defendants' foregoing acts and omissions, Plaintiffs and the other members of the Class collectively suffered millions of dollars in losses on their investments in GPC securities.

## II.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to: (a) Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and (b) 28 U.S.C. §§ 1331 and 1337.

14.    This action arises under and pursuant to: (a) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); (b) Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and (c) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

15.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.    In furtherance of and in connection with the acts and omissions alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephonic communications, the Internet, and the facilities of the NASDAQ, a national securities exchange.

## III.

## PARTIES

### A.

### *Plaintiff*

17.    Plaintiff Istvàn Temesfoï purchased the Company's securities during the Class Period, as set forth in his attached Certification, and was damaged thereby.

B.

*Defendants*

18.    Defendant GPC Biotech AG is a publicly traded biopharmaceutical company that specializes in the development of new anticancer drugs.  It maintains executive offices at Fraunhofenstrasse 20, Munich, Germany 82152.  Its sponsored American Depositary Receipts ("ADRs") evidencing American Depositary Shares are registered in this District and trade on the NASDAQ under the symbol "GPCB."

19.    Defendant Bernd R. Seizinger ("Seizinger") has been Chief Executive Officer of GPC since 1998, when he joined the Company from Genome Therapeutics Corporation of Waltham, Massachusetts, where he was Executive Vice President and Chief Scientific Officer for over a decade.  Before that, Seizinger was an executive officer at Bristol-Myers Squibb Pharmaceutical Research Institute in Princeton, New Jersey, where he was Vice President of Oncology Drug Discovery and Vice President of Corporate and Academic Alliances.

20.    Defendant Martine George ("George"), GPC's Senior Vice President for Clinical Development, is an oncology expert with over fifteen years of experience in medical academia and at leading pharmaceutical companies.  Before coming to GPC, George was a Senior Vice President and Head of Oncology at Johnson & Johnson's Pharmaceutical Research and Development division.  Prior to that, she held several executive posts in clinical and medical affairs, including at Johnson & Johnson, Rohne-Poulenc Rorer, Sandoz Pharmaceuticals Corporation, and American Cynamid.

21.    Defendant Marcel Rosenczweig ("Rosenczweig"), GPC's Chief Medical Officer and Senior Vice President for Drug Development, joined GPC Biotech in 2001.

Previously, he worked for Bristol-Myers Squibb for nearly twenty years, where he held several senior leadership positions in drug development and strategic planning, including Vice President, Oncology, Infectious Diseases and Immunology Clinical Research; and Vice President, Strategic Planning and Portfolio Management.  GPC's website describes Rosenczweig as "a world-renowned expert in oncology drug development."

22.     Defendants Seizinger, George, and Rosenczweig, each a member of GPC's Executive Committee, are collectively referred to as the "Individual Defendants."  GPC and the Individual Defendants are collectively referred to as "Defendants."

**IV.**

**SUBSTANTIVE ALLEGATIONS**

23.     GPC was founded in 1997 and, since 2002, has concentrated its research and development efforts on Satraplatin, an oral therapy for prostate cancer patients resistant to traditional treatment programs.

24.     GPC could not raise the capital necessary to fund its operations without demonstrating steady progress toward the commercialization of Satraplatin.  To this end, in 2003 the Company devised a plan for what it referred to as a "SPARC" (Satraplatin and Prednisone Against Refractory Cancer) Trial.

25.     The SPARC Trial was long and complicated.  Among other things, Defendants knew that drugs like Satraplatin with serious side effects rarely gain FDA approval unless they substantially prolong life, reduce pain, or slow the progress of disease.  These and other factors that gauge a drug's effectiveness are measured by "endpoints," specific goals a drug manufacturer seeks to achieve that must fairly reflect the FDA's prerequisites for the approval and commercialization of a new drug.

26.    The FDA has processed thousands of new drug applications and, through this process, has established a variety of generally accepted endpoints.  Despite their considerable experience with the testing and approval process for new drugs, Defendants refused to adopt any of these established endpoints and, instead, fashioned a new one that they thought Satraplatin could easily meet, notwithstanding undisclosed warnings from the FDA that Defendants' chosen methodology had not been shown to yield reliable results.  Defendants actively concealed these matters from the investing public throughout the Class Period.

27.    On December 5, 2005, the first day of the Class Period, GPC issued a press release entitled "GPC Biotech Announces Achievement of Target Enrollment in Satraplatin Phase 3 Registrational Trial (SPARC) for Second-Line Chemotherapy of Hormone Refractory Prostate Cancer."  It stated, in relevant part, as follows:

> GPC Biotech AG ... today announced the achievement of target enrollment in the Phase 3 registrational trial of its lead drug candidate Satraplatin, the only orally bioavailable platinum-based compound in advanced clinical development.  More than 200 clinical sites in fifteen countries on four continents have now achieved the goal of accruing 912 patients to the SPARC (Satraplatin and Prednisone Against Refractory Cancer) trial.  A number of additional patients are in screening, and the Company will allow those patients to complete the process and either be randomized into the trial or disqualified, in accordance with the trial protocol.  The SPARC trial is a multicenter, multinational, double blind, randomized study that is assessing the safety and efficacy of Satraplatin in combination with prednisone as a second-line chemotherapy in patients with hormone-refractory prostate cancer (HRPC).
>
> "We are excited to have achieved this major milestone in the development of Satraplatin.  This is indeed a significant accomplishment for GPC Biotech," said Bernd R. Seizinger, M.D., Ph.D., Chief Executive Officer.  "The rapid accrual rate of the SPARC trial supports the need for effective second-line chemotherapy treatments for hormone-refractory prostate cancer

patients.  We are thus committed to completing the study and moving forward in the registration process as expeditiously as possible."

"The accrual goal of 912 patients was reached in just over 26 months, making the SPARC trial one of the fastest accrued Phase 3 clinical trials for chemotherapy drugs in prostate cancer.  This rapid enrollment was made possible by the dedication and hard work of the clinical investigators, the study site personnel and our own drug development team," said Marcel Rosenczweig, M.D., Senior Vice President, Drug Development.  "I would like to thank them, as well as all of the patients who participated in the trial."

28.    These announcements were warmly received by the market, which had been deprived of the knowledge that Defendants had chosen an endpoint unlikely to be accepted by the FDA.  But Defendants' scheme did permit the Company to raise the new funds it desperately needed to fund its continuing operations.  On February 23, 2006, for example, GPC announced that it had completed a private placement of 2.86 million shares, thereby infusing approximately $49 million into the Company.

29.    On February 27, 2006, Defendants released a wealth of positive data on Satraplatin.  In a press release, the Company falsely stated: "Satraplatin appeared to be well tolerated, with no significant cardio-, renal, liver or neurological toxicities observed. Other common toxicities like nausea, vomiting and diarrhea were mild to moderate and were reported to be controlled with prophylactic oral anti-emetic therapy."

30.    On March 15, 2006, Defendants disclosed that GPC had cash outflows of approximately $60 million during fiscal year 2005, but reassured investors that its ostensible progress with Satraplatin had allowed it to secure additional sources of significant operating capital: "Of note, in the first quarter of 2006, the Company received an additional €67.5 million from an upfront development-related payment of €31.3 million from its partner Pharmion in connection with the co-development and license

agreement signed in December 2005 and €36.2 million through a private placement with two investment companies ...."

31.    On April 25, 2006, Defendants announced that the SPARC Trial had passed a "futility analysis" and could thus forge ahead. Defendants failed to disclose, however, that this analysis only evaluated whether the new drug has a possibility of satisfying the endpoint defined by GPC and does not signal agreement with the reliability or validity of the endpoint. In a press release, Defendants stated, among other things:

> "We are delighted that the independent Data Monitoring Board made this recommendation and that Satraplatin passed the futility analysis," said Bernd R. Seizinger, M.D., Ph.D., Chief Executive Officer. "The results of this planned interim analysis are as expected--namely that the Board has recommended that the SPARC trial continue to its completion. We look forward to reporting the final PFS results from the trial this fall and, if the data are positive, we anticipate completing the NDA filing by the end of 2006. In parallel to completing the registrational trial, we will continue to initiate additional clinical trials with Satraplatin in other cancer indications and in combination with other anticancer treatments."

32.    On September 24, 2006, Defendants issued a press release stating that Satraplatin had yielded positive topline results for the endpoint chosen by the Company-- "progression free survival" or "PFS." But Defendants failed to mention that this was an endpoint that had no demonstrated reliability and that was not recognized by the FDA, or that the FDA had specifically advised Defendants that PFS was not a established endpoint. The press release stated, in pertinent part, as follows:

> Using the protocol-specified hazard ratio, which measured the overall risk of disease progression, patients in the SPARC trial who received Satraplatin plus Prednisone had a 40% reduction in the risk of disease progression (hazard ratio of 0.6; 95% Confidence Interval: 0.5-0.7) compared with patients who received Prednisone plus placebo. The improvement seen in progression-free survival by patients treated with Satraplatin increased over

time.  Progression-free survival at the median (50th percentile)
demonstrated a 13% improvement in patients who received
Satraplatin plus prednisone (11 weeks) compared to patients who
received Prednisone plus placebo (9.7 weeks).  Progression-free
survival at the 75th percentile showed an 89% improvement for
patients in the Satraplatin arm (36 weeks) versus patients in the
placebo arm (19 weeks).  At 6 months, 30% of patients in the
Satraplatin arm had not progressed, compared to 17% of patients in
the control arm.  At 12 months, 16% of patients who received
Satraplatin had not progressed, compared to 7% of patients in the
control arm.  All of these analyses were conducted on an intent-to-
treat basis.

33.    On November 9, 2006, GPC issued another rosy press release about

Satraplatin that failed to disclose the adverse information concerning the unorthodox

methodology GPC was using to test the drug.  In the release, Defendants stated as

follows:

Bernd R. Seizinger, M.D., Ph.D., Chief Executive Officer, said:
"In the third quarter of 2006, we achieved a landmark event in the
corporate history of GPC Biotech, with the announcement of
positive results on progression-free survival from our Phase 3
registrational trial with our lead anticancer drug candidate
Satraplatin.  These results will form the basis of our NDA filing,
which we expect to submit to the FDA in the next six to twelve
weeks, with the goal of filing by the end of this year.  They will
also serve as the basis for our partner Pharmion to move forward
with the MAA filing in Europe in the first half of 2007.  We are
also moving forward aggressively to further build our marketing
and sales infrastructure in the U.S. for the commercialization of
Satraplatin."

34.    These purportedly positive developments allowed GPC to raise additional

capital from private investors.  In a January 24, 2007 press release, Defendants stated, in

pertinent part:

GPC Biotech ... has raised gross proceeds of €33.6 million
(approximately $43.7 million) in a private placement with
institutional investors.  GPC Biotech sold 1,564,587 million shares
at a price of €21.50/share and will receive the proceeds upon
registration of the corresponding capital increase.  The share price

and the number of shares were determined by an accelerated bookbuilding procedure with an underwriter.

"With the announcement this past fall of positive data from the Satraplatin Phase 3 trial in second-line hormone refractory prostate cancer, we were able to accelerate the building of our commercialization infrastructure in the U.S.," said Bernd R. Seizinger, M.D., Ph.D., Chief Executive Officer. "The funds we have raised will assist us both in aggressively moving forward with commercialization activities, as well as continuing to expand the development of Satraplatin in other cancer settings."

35.    On February 23, 2007, Defendants issued still another glowing press release, which omitted the adverse information known to them about the questionable endpoint for the SPARC Trial and falsely downplayed Satraplatin's toxicity levels:

GPC Biotech AG ... today announced that final progression-free survival (PFS) results for the double-blind, randomized Satraplatin Phase 3 registrational trial, the SPARC trial (Satraplatin and Prednisone Against Refractory Cancer) are being presented today at the ASCO Prostate Cancer Symposium in Orlando, Florida. The trial is evaluating Satraplatin plus Prednisone versus placebo plus Prednisone in 950 patients with hormone-refractory prostate cancer (HRPC) who have failed prior chemotherapy. All analyses of PFS being presented were conducted on an intent-to-treat basis.

Safety findings were consistent with previous clinical studies involving Satraplatin. The reported adverse reactions were mostly mild to moderate in severity. The most common adverse reactions consisted of myelosuppression (bone marrow functions): Twenty-one percent of patients in the Satraplatin arm experienced grade 3 or 4 thrombocytopenia; 14 percent had leucopenia and 21 percent had neutropenia. Eight percent of patients in the Satraplatin arm experienced grade 3 or 4 gastrointestinal toxicities, including nausea, vomiting, diarrhea and constipation. Five percent or less of patients in the Satraplatin arm experienced grade 3 or 4 fatigue, grade 3 or 4 infections and pulmonary/respiratory grade 3 or 4 toxicities.

36.    On May 15, 2007, Defendants issued another false and misleading press release, which stated, in relevant part, as follows:

> Bernd R. Seizinger, M.D., Ph.D., Chief Executive Officer, said:
> "We have already had several key achievements in the first few
> months of 2007, including completion of the NDA submission for
> Satraplatin and its acceptance for filing by the FDA.  We are very
> pleased that FDA has granted the NDA submission priority review
> status and look forward to an action by the agency in August this
> year."

> Dr. Seizinger [stated]: "We are very busy preparing for the
> possible U.S. launch of Satraplatin later this year.  With the
> acceptance of the NDA filing and the assignment of priority review
> by the FDA, and with the senior management of our U.S.
> marketing and sales organization in place, we have begun to hire
> the field sales force.  In addition, we continue to move forward
> Satraplatin clinical trials in other oncology indications, as well as
> our other development and discovery programs."

> "We are delighted with the strong detailed results presented today
> from the Satraplatin SPARC Phase 3 trial," said Bernd P.
> Seizinger, M.D., Ph.D., Chief Executive Officer of GPC Biotech.
> "Moving forward, we plan to work closely with the FDA regarding
> our application for marketing approval of Satraplatin in the U.S.
> We also are continuing to aggressively build our marketing and
> sales organization in the U.S. to prepare for a potential launch of
> Satraplatin later this year."

37.     Defendants revealed none of the adverse information about Satraplatin and

its novel endpoint testing methodology until they were forced to as a result of FDA

action.  On May 15, 2007, Defendants announced that the FDA would consider approval

of Satraplatin during a July 24, 2007, meeting.  On that day, GPC stock ended the trading

session at $28.50 per share.  Early the next month, on June 4, 2007, the Company

participated in an oncology conference where it presented data that showed Satraplatin

was very effective and, as a result, GPC stock climbed $3.16 to close at $32.81 per share.

38.     These auspicious pronouncements stood in sharp contrast to the adverse

news that began to emerge on July 20, 2007, when an FDA committee issued preliminary

comments in advance of the July 24, 2007, meeting with the Company.  Among other

things, the committee questioned the benchmarks for assessing Satraplatin's effectiveness, principally including a so-called "composite endpoint." The committee indicated that the FDA was unfamiliar with this kind of endpoint, which had been "clearly communicated" to the Company during the drug's developmental phase. GPC stock in turn plummeted $10.85 over the next two trading days, closing at $20.95 on July 23, 2007.

39.     After the close of trading on July 24, 2007, the FDA revealed that its Oncologic Drugs Advisory Committee had advised against approval for Satraplatin and that it would not reconsider the drug until the end of 2008. In response to this news, GPC stock fell another $7.20, to close at $13.16 on July 25, 2007. The Company has since withdrawn its new drug application for Satraplatin and, collectively, GPC investors have suffered millions of dollars in losses.

## V.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

40.     At all relevant times, the market for GPC securities was an efficient market for the following reasons, among others:

a.      GPC ADRs were listed and actively traded, among other places, on the NASDAQ, a highly efficient market;

b.      As a regulated issuer, the Company filed periodic public reports with the SEC;

c.      GPC securities were followed by analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

        d.     GPC regularly issued press releases which were carried by national news wires. Each of these releases was publicly available and entered the public marketplace.

    41.    As a result, the market for GPC securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of GPC securities during the Class Period suffered similar injury through their purchase of securities at artificially inflated prices and a presumption of reliance applies.

## VI.

## NO SAFE HARBOR

    42.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The specific statements pleaded herein were not identified as "forward-looking statements" when made. Nor was it stated with respect to any of the statements forming the basis of this complaint that actual results "could differ materially from those projected." To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking was made the particular

speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## VII.

## ADDITIONAL SCIENTER ALLEGATIONS

43.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements, issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company and its business practices, their control over and/or receipt of the Company's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential proprietary information concerning GPC, were active and culpable participants in the fraudulent scheme alleged herein.  Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  This case does not involve allegations of false forward-looking statements or projections but instead involves false statements concerning the Company's business, finances, and operations.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has

occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the individual Defendants.

44.     Defendants engaged in such a scheme to inflate the price of GPC securities in order to: (a) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; and (b) enhance the value of their personal holdings of GPC stock and options.

45.     Defendants were also motivated to engage in the fraudulent conduct alleged because they understood from the beginning of the Class Period that GPC was cash starved, and fabricating a new and unorthodox endpoint for Satraplatin was the only means to show "progress," despite the fact that each of the Defendants was well aware that any such "progress" was, in fact, a total fiction.

46.     Finally, in the week immediately preceding the FDA's announcement that it would recommend against approval of Satraplatin, Defendant Seizinger exercised options to purchase, and then sold, 75,660 shares of GPC stock, thereby reaping proceeds of €1,735,640.40.  This transaction occurred on July 19, 2007--just one day before the FDA released public comments indicating that the clinical trials for Satraplatin were deeply flawed and that approval for the drug would likely be withheld.

## VIII.

## LOSS CAUSATION

47.     During the Class Period, as detailed herein, Defendants participated in a scheme to deceive the market and a pattern of conduct that artificially inflated the price of GPC securities and operated as a fraud or deceit on Class Period purchasers of GPC securities by failing to disclose the true facts concerning the SPARC Trial.  As set forth

above, when Defendants' prior misrepresentations and omissions were revealed to the market, the price of GPC securities promptly fell as the prior artificial inflation was reversed. As a result of their purchases of GPC securities during the Class Period, Plaintiff and other Class members thus suffered economic loss (damages within the meaning of the federal securities laws).

48.    Defendants' false and misleading statements had their intended effect, prompting GPC securities to trade at artificially inflated levels throughout the Class Period. For example, GPC common stock reached prices exceeding $30 per share.

49.    As a direct and proximate result of the disclosures made by Defendants in July 2007, the prices of GPC securities fell precipitously, as detailed elsewhere herein. These declines in prices removed the inflation (caused in the first instance by Defendants' false and misleading statements) from the price of GPC securities, thereby resulting in true economic loss to investors who had purchased the Company's securities during the Class Period.

50.    The substantial decline in the price of GPC common stock following these disclosures was a direct result of the nature and extent of Defendants' fraud being revealed to the market. The size and timing of these stock price declines defeats any inference that the losses sustained by Plaintiff and the other Class members were the result of market conditions, macroeconomic or industry factors, or developments specific to the Company unrelated to Defendants' fraudulent conduct.

## IX.

## CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class, consisting of all persons who purchased or otherwise acquired GPC securities between December 5, 2005, and July 24, 2007, and who were damaged thereby. Excluded from the Class are Defendants, members of the immediate family of each of the Defendants, any subsidiary, affiliate, or parent of GPC and the directors, officers, and employees of GPC or its subsidiaries, affiliates, or parents, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

52.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States and Europe. Throughout the Class Period, GPC ADRs actively traded on the NASDAQ (an open and efficient market) under the symbol "GPCB." GPC shares likewise were actively traded on the Deutsche Bourse, a highly automated and efficient securities exchange. Record owners and other members of the Class may be identified from records maintained by the Company and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

53.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

54.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

55.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.     whether Defendants participated in and pursued the common course of conduct complained of herein;

c.     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition, and prospects of GPC;

d.     whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance, and prospects of the Company;

e.     whether the market price of GPC securities during the Class Period were artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.    the extent to which the members of the Class have sustained damages and the proper measure of damages.

56.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## X.

## COUNTS

### FIRST CLAIM

**(Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants)**

57.    Plaintiff repeats and realleges each and every allegation contained above.

58.    Each of the Defendants: (a) knew or recklessly disregarded material adverse non-public information about the Company's financial results and then existing business conditions, which was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports, and other public representations of and about GPC.

59.    During the Class Period, Defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

60.    Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of GPC securities during the Class Period.

61.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for GPC securities, which inflation was reversed when the nature and extent of Defendants' false and misleading statements was revealed.  Plaintiff and the Class would not have purchased GPC securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

## SECOND CLAIM

### (Violations Of Section 20(a) Of The Exchange Act Against The Individual Defendants)

62.    Plaintiff repeats and realleges each and every allegation contained above.

63.    The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act.  By reason of their senior executive and/or Board positions they had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.

64.    By reason of such wrongful conduct, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of these

Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered

damages in connection with their purchases of GPC securities during the Class Period.

## XI.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

1.    Determining that this action is a proper class action and certifying Plaintiff

as class representative under Rule 23 of the Federal Rules of Civil Procedure;

2.    Awarding compensatory damages in favor of Plaintiff and the other Class

members against all Defendants, jointly and severally, for all damages sustained as a

result of Defendants' wrongdoing, in an amount to be proven at trial, including interest

thereon;

3.    Awarding Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

4.    Such other and further relief as the Court may deem just and proper.

## XII.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: August 6, 2007

Respectfully submitted,

SHALOV STONE BONNER & ROCCO LLP

By: _____
      Ralph M. Stone
      Thomas G. Ciarlone, Jr.

485 Seventh Avenue, Suite 1000
New York, NY 10018
(212) 239-4340
Fax (212) 239-4310

*Attorneys for Plaintiff*

*Of counsel:*

Bernd Jochem
ROTTER RECHTSANWÄLTE
Luise-Ullrich-Strasse 2
83021 Grünwald
Germany
(49) 89.64.98.45.0
Fax (49) 89.64.98.45.40

## CLASS ACTION CERTIFICATION

I declare as to the claims asserted under the federal securities laws that:

1.      I have reviewed the complaint prepared by counsel in the above-captioned case and authorize the filing of the same or a similar complaint on my behalf.

2.      I did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      During the proposed Class Period, I executed the following transactions relating to GPC Biotech securities (fill in dates and amounts of all transactions, indicating "bought" or "acquired" and "sold" and prices):

| 02/26/2007 | Bought | 169 shares | EUR | 24,88/share |
| 02/26/2007 | Bought | 479 shares | EUR | 24,85/share |
| 02/26/2007 | Bought | 7.632 shares | EUR | 24,84/share |
| 02/26/2007 | Bought | 400 shares | EUR | 24,89/share |
| 02/26/2007 | Bought | 1.320 shares | EUR | 24,90/share |
| | | | | |
| 07/27/2007 | Sold | 1.625 shares | EUR | 7,77/share |
| 07/27/2007 | Sold | 300 shares | EUR | 7,76/share |
| 07/27/2007 | Sold | 4.769 shares | EUR | 7,74/share |
| 07/27/2007 | Sold | 3.306 shares | EUR | 7,75/share |

5.      In the past three years, I have not sought to serve nor served as a representative party on behalf of a class in an action filed under the federal securities laws.

6.      I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this _03_ day of _Aug_, 2007.

Signed:        _____

Print your name:        _____Istvàn Temesföi_____